***********
Upon review of the competent evidence of record, with reference to the errors assigned, and finding no good grounds to receive further evidence, or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms, with modifications, and addresses the additional issues raised on remand by the Opinion and Award of the Deputy Commissioner, and enters the following Opinion and Award.
 *********** EVIDENTIARY RULING
By correspondence dated September 14, 2007, Piedmont Metro Service Co. and North Carolina Insurance Guaranty Association (hereinafter referred to as "Defendants") requested that the following exhibit be admitted into evidence: Pezdek Exhibit one (1) — Correspondence from Dr. Thomas N. Pezdek concerning corrections to be made to his January 27, 1999 treatment plan for Plaintiff and accompanying documentation. The Full Commission hereby ORDERS that Pezdek Exhibit one (1) be admitted into evidence.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which the parties entered into in their Pre-trial Agreement and at the hearing as: *Page 3 
 STIPULATIONS
1. Plaintiff suffered an alleged compensable injury by accident arising out of and in the course and scope of his employment with Piedmont Metro Service Co. (hereinafter referred to as "Defendant-Employer") on September 23, 1997.
2. The parties were subject to the North Carolina Workers' Compensation Act at the time of Plaintiff's alleged September 23, 1997 work injury.
3. Defendant-Employer employed three (3) or more employees at the time of Plaintiff's alleged September 23, 1997 work injury.
4. North Carolina Insurance Guaranty Association (hereinafter referred to as "Defendant-Carrier") is providing workers' compensation insurance coverage for Plaintiff's alleged September 23, 1997 work injury.
5. Plaintiff's average weekly wage is $611.51.
6. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits at the hearing before Deputy Commissioner Myra L. Griffin: Stipulated Exhibit one (1) — Pre-trial Agreement, North Carolina Industrial Commission forms and filings, and Plaintiff's medical records.
7. The parties stipulated to the following documents being admitted into evidence as stipulated exhibits at the evidentiary hearing before Deputy Commissioner Bradley W. Houser addressing the additional issues raised on remand:
 a. Stipulated Exhibit one (1) — Pre-trial Order;
 b. Stipulated Exhibit two (2) — Additional medical records for Plaintiff. *Page 4 
8. In addition to the stipulated exhibits, Deputy Commissioner Bradley W. Houser admitted the following exhibits into evidence at the evidentiary hearing addressing the additional issues:
 a. Plaintiff's Exhibit One (1) — Correspondence dated October 13, 2006 and accompanying documentation concerning Plaintiff's home health care expenses;
 b. Plaintiff's Exhibit Two (2) — Photograph of Plaintiff's leg.
 *********** ISSUES
The issues for determination are:
1. Whether Plaintiff is entitled to permanent partial disability ratings for the alleged September 23, 1997 work injury?
2. Whether injuries to three (3) of Plaintiff's teeth are related to his alleged September 23, 1997 work injury?
3. Whether Plaintiff is entitled to reimbursement for the home health care provided by Ms. Betty Lyles to Plaintiff following Plaintiff's release from the hospital?
4. Whether Plaintiff is entitled to payment for a computed tomography (CT) myelogram to Plaintiff's back, as well as an arthroscopic acromioplasty and subacromial bursectomy to his right shoulder?
5. Whether Dr. Carlos Adrian Sotolongo should be Plaintiff's authorized treating physician?
6. Whether Plaintiff is entitled to reimbursement for a number of prescriptions he paid for out-of-pocket? *Page 5 
7. Whether Plaintiff is entitled to payment for a stimulator device for pain management?
8. Whether Plaintiff is entitled to payment for surgical correction of a protrusion on Plaintiff's leg at his previous surgical site?
9. Whether Plaintiff is entitled to recover attorney's fees, pursuant to § 97-88.1 of the North Carolina General Statutes?
 ***********
Based upon the competent and the credible evidence of record, as well as any reasonable inferences that may be drawn therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 69 years old, and has a high school diploma. Upon high school graduation, Plaintiff attended Hartford State Technical Community College and studied electrical engineering.
2. Plaintiff worked approximately nine (9) to 10 years as a heating and air conditioning technician for Defendant-Employer, repairing heating and air conditioning equipment, as well as assisting with installations of heating and air conditioning equipment. On September 23, 1997, Plaintiff sustained a compensable work injury when he fell approximately 15 feet from a ladder while performing repair work on some heating and air conditioning equipment.
3. Shortly after the September 23, 1997 work injury occurred, emergency medical personnel transported Plaintiff to Duke University Medical Center, where Plaintiff came under the care of Dr. Frank Houston Bassett, III, an orthopaedic surgeon. Dr. Bassett diagnosed Plaintiff with a fracture of the right femur, a fracture of the right wrist, and an inter-trochanteric *Page 6 
fracture within the right hip.
4. Plaintiff underwent a closed reduction and external fixation to repair his fractured right wrist. As a result of the compression to Plaintiff's median nerve following this surgery, Plaintiff underwent a right carpal tunnel release. Plaintiff's right hip fracture required an open reduction and internal fixation in order to repair it. Soon after the September 23, 1997 work injury, Plaintiff experienced impingement within his right shoulder, which Dr. Bassett diagnosed as adhesive capsulitis. Plaintiff received conservative treatment for the adhesive capsulitis, including physical therapy. Thereafter, Plaintiff's adhesive capsulitis continued to improve with time.
5. Following the September 23, 1997 work injury injury, Ms. Betty Lyles provided home health care services for Plaintiff, as Plaintiff was single, had no other family to care for him, lived in a second (2nd) floor apartment, and was unable to ambulate or to otherwise care for himself, due to his multiple fractures. Ms. Lyles provided such home health care services to Plaintiff from September 28, 1997 through December 14, 1997.
6. Plaintiff eventually returned to work for the successor-in-interest of Defendant-Employer, earning a greater hourly wage than he earned at the time of the work injury. As of the date of the hearing before Deputy Commissioner Griffin, Plaintiff was continuing to work as a heating and air conditioning technician with Defendant-Employer's successor-in-interest.
7. Defendants accepted Plaintiff's claim via a Form 21 on or about October 14, 1997. Subsequently, Defendants filed a Form 28 indicating that Plaintiff returned to work. Defendants paid temporary total disability compensation from September 23, 1997 through September 14, 1998.
8. On September 9, 1998, Dr. Bassett determined that Plaintiff was at maximum *Page 7 
medical improvement. With respect to Plaintiff's right upper extremity, Dr. Bassett opined that Plaintiff suffered a 30 percent permanent partial disability rating. In his September 9, 1998 progress note, Dr. Bassett explained that the basis for this rating was due to "the tightness of the right shoulder, the weakness in the grip of the right hand, the limitation of motion of the wrist and the decreased sensation over the median nerve distribution." Further, Dr. Bassett anticipated some arthritic change at the wrist level as Plaintiff became older. Dr. Bassett also assigned Plaintiff a 20 percent permanent partial disability rating to his right lower extremity. Dr. Bassett based the assignment of this rating on the 25 percent decreased strength in Plaintiff's right hip, the minimal limits on range of motion in Plaintiff's hip, and the "possibility of future thrombophlebitis."
9. On January 25, 1999, Plaintiff came under the care of Dr. Thomas N. Pezdek, a general dentist. Dr. Pezdek examined Plaintiff's teeth, noted that Plaintiff had several missing teeth, as well as severe tooth decay, due to neglect of his teeth, and developed a treatment plan in order to replace Plaintiff missing teeth. Dr. Pezdek never saw Plaintiff after this initial visit. Dr. Pezdek testified that it would take somewhere between 10 and 15 years for tooth decay this severe to develop. Dr. Pezdek further testified that he would have no way of determining to what extent Plaintiff's tooth decay caused the broken teeth, or whether Plaintiff's September 23, 1997 work injury either caused or contributed to any of the broken teeth. Dr. Pezdek explained that since he never treated Plaintiff prior to January 25, 1999, or prior to Plaintiff's September 23, 1997 work injury, he had no means by which to compare the condition of Plaintiff's teeth before and after the work injury, and thus, no means by which to offer an opinion concerning the causation of Plaintiff's broken teeth.
10. On April 1, 1999, Plaintiff came under the care of Dr. Richard Todd Ferro, who *Page 8 
assumed Plaintiff's care from Dr. Bassett, upon Dr. Bassett's retirement. At that time, Plaintiff reported suffering from constant low back pain, as well as pain and swelling over the surgical site of his right thigh. Dr. Ferro noted that Plaintiff walked with a limp, which seemed to exacerbate his chronic lower back pain. During Dr. Ferro's April 1, 1999 examination of Plaintiff, Dr. Ferro assigned Plaintiff a 50 percent permanent partial disability rating to his right leg, a 50 percent permanent partial disability rating to his right arm, 50 percent permanent partial disability rating to his right hand, and a 50 percent permanent partial disability rating to his back. Dr. Ferro examined Plaintiff on no more than two (2) visits.
11. By correspondence dated August 17, 1999, Dr. Ferro provided further explanation for the various ratings he assigned to Plaintiff. In this correspondence, Dr. Ferro based his permanent partial disability ratings on the weakness and limitations of Plaintiff's right wrist and right shoulder, as well as the decreased sensation over Plaintiff's median nerve. Dr. Ferro also stated that he assigned Plaintiff an additional 50 percent permanent partial disability rating to the right hand, in addition to the right arm, because the weakness and limitations of the wrist and shoulder affected Plaintiff's ability to use his hand. Further, Dr. Ferro opined that a 50 percent permanent partial disability rating to Plaintiff's back is appropriate, due to the very high probability of Plaintiff having recurrent future back problems. At the time of Dr. Ferro's assignment of Plaintiff's permanent partial disability ratings, Plaintiff's diagnostic studies were unavailable for review by Dr. Ferro. Finally, Dr. Ferro stated that he assigned a 50 percent permanent partial disability rating to Plaintiff's "legs" (Plaintiff only fractured his right leg in his September 23, 1997 work injury), based on the decreased strength and tight quadricep muscles in Plaintiff's lower extremity, the limited range of motion in Plaintiff's hip, and Plaintiff's reports of chronic pain in his legs. *Page 9 
12. On May 7, 2002, Dr. Robert John Wilson, III, one of Plaintiff's treating physicians, indicated that in treating Plaintiff for mid-thoracic back pain, he found that Plaintiff's back complaints were due in part to "significant paraspinal tightness facet restriction," as well as "some degenerative thoracic spine changes T9-10 and mild T4 anterior compression deformity." As a result, Dr. Wilson recommended magnetic resonance imaging (MRI) of the spine; however, Plaintiff was unable to undergo this MRI, due to "severe claustrophobia." Thus, Dr. Wilson recommended that Plaintiff undergo a CT myelogram in order to help diagnose and treat Plaintiff's back complaints. Dr. Wilson stated that he believed that this was an "extremely reasonable diagnostic study for this problem area [Plaintiff's back]."
13. On May 9, 2002, Dr. William James Mallon, another of Plaintiff's authorized treating physicians, recommended an arthroscopic acromioplasty and subacromial bursectomy to Plaintiff's right shoulder, due to Plaintiff's chronic shoulder complaints following his September 23, 1997 work injury. Dr. Mallon stated that Plaintiff's diagnosis is "almost certainly at this point a subacromial bursitis and/or rotator cuff tendonitis of the right shoulder," that Plaintiff "had this problem for up to 4 years," that an arthroscopic acromioplasty and a subacromial bursectomy to his right shoulder would both be very reasonable options to consider performing on Plaintiff, and that only a surgical approach would likely be able to provide relief to his shoulder complaints, at that point.
14. For several years after Plaintiff's September 23, 1997 work injury, he sought treatment for some of the injuries and complaints related to the work injury from Dr. Carlos Adrian Sotolongo, including pain management through prescription oral pain medication. Dr. Sotolongo also provided Plaintiff with referrals to orthopaedic and other specialists, such as Dr. Wilson and Dr. Mallon. *Page 10 
15. On October 19, 2004, Executive Secretary Tracey H. Weaver approved Plaintiff's Form 18M, which awarded Plaintiff ongoing medical treatment for his back, right shoulder, and right lower extremity complaints related to his September 23, 1997 work injury.
16. On November 3, 2004, Plaintiff presented to Dr. Catherine Ann Lawrence Duncan for an independent medical evaluation. Plaintiff reported thoracic back pain as his chief complaint. Dr. Duncan undertook an extensive medical record review, and discussed at length Plaintiff's medical history during this appointment. Dr. Duncan observed that Plaintiff had a normal gait and station, and that his lumbar range of motion was within normal limits. Dr. Duncan diagnosed Plaintiff with thoracic strain/sprain and myofascial pain, and recommended that Plaintiff participate in a course of physical therapy.
17. Thereafter, from March 2, 2005 through July 7, 2005, Dr. Duncan provided treatment for Plaintiff. During this time, Plaintiff reported continued thoracic pain with no mention of lumbar or cervical pain. On July 7, 2005, Dr. Duncan opined that Plaintiff's back was at maximum medical improvement, and assigned a 3 percent permanent partial disability rating to Plaintiff's back. When questioned about the 50 percent permanent partial disability rating to Plaintiff's back assigned by Dr. Ferro, Dr. Duncan opined that this rating was inappropriate, based upon her examination of Plaintiff, his range of motion, his functionality, her neurological evaluation of Plaintiff, his strength, his overall pain level, and his response to her recommended course of treatment.
18. In July 2005, both Dr. Duncan and the physical therapist recommended by her recommended that Plaintiff undergo a trial of a stimulator device for assistance with pain management. Plaintiff continues to utilize this stimulator device to assist with his pain management; however, there is some dispute as to who owns the actual stimulator device, and *Page 11 
whether Defendants will continue to authorize use of the stimulator device by Plaintiff.
19. On August 14, 2006, Plaintiff came under the care of Dr. Guido Peter Gutter, who evaluated a protruding mass on Plaintiff's right leg at the site of Plaintiff's right hip/leg surgery related to his September 23, 1997 work injury. Dr. Gutter noted that Plaintiff had a "right femoral scar and walks with a `limp,'" and described the mass measured as a "24 cm long non-distended right femoral scar, except in the distal aspect is a soft protruding mss (4.7 x 3.5 cm)." Dr. Gutter diagnosed Plaintiff with a "[h]ernia TFL right femur," and indicated that he could repair the hernia with "exploration and repair and possible `patch' of mesh/fascia/dermis." Finally, Dr. Gutter opined that the scar and hernia following his surgical repair of Plaintiff's right leg would "amount to a 15 % disability." Plaintiff provided a photograph of his right leg as an exhibit in the evidentiary hearing before Deputy Commissioner Houser addressing the additional issues not addressed by Deputy Commissioner Myra L. Griffin.
20. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff suffered a compensable injury by accident arising out of and in the course and in the scope of his employment with Defendant-Employer on September 23, 1997.
21. The Full Commission finds, based upon the greater weight of the evidence, that greater weight should be given to the testimony of Dr. Bassett and Dr. Duncan with regard to the assignment of Plaintiff's permanent partial disability ratings. Both Dr. Bassett and Dr. Duncan examined and treated Plaintiff over an extended period of time, and Dr. Bassett and Dr. Duncan provided sufficient explanation of the assignment of their respective ratings, based upon their extended treatment and familiarity with Plaintiff's conditions. Further, with respect to Plaintiff's contention that he should be entitled to a separate permanent partial disability rating to his right hand, the Full Commission finds, based upon the greater weight of the evidence, that there is *Page 12 
insufficient objective testing or other evidence to support a finding that Plaintiff's right hand suffers from a specific disability separate and apart from the disability addressed by the right arm rating. Although Dr. Ferro opined that the weakness and limitations of Plaintiff's wrist and shoulder affected Plaintiff's ability to use his hand, there is no objective testing to corroborate this subjective opinion, based solely upon a single visit with Dr. Ferro.
22. The Full Commission finds, based upon the greater weight of the evidence, that there is insufficient evidence establishing any type of causal relationship between three (3) of Plaintiff's missing teeth and his September 23, 1997 work injury. Dr. Pezdek, the only expert witness qualified to render opinions regarding Plaintiff's teeth, in this case, testified that it would take somewhere between 10 and 15 years for tooth decay as severe as Plaintiff's to develop; that he would have no way of determining to what extent Plaintiff's tooth decay caused the broken teeth, or whether Plaintiff's September 23, 1997 work injury either caused or contributed to any of the broken teeth, since he never treated Plaintiff prior to January 25, 1999, or prior to Plaintiff's September 23, 1997 work injury; and that he had no means by which to compare the condition of Plaintiff's teeth before and after the work injury, and thus, no means by which to offer an opinion concerning the causation of Plaintiff's broken teeth.
23. At the telephone hearing before the Full Commission, Defendants agreed that they would reimburse Plaintiff for the home health care provided to Plaintiff by Ms. Betty Lyles following Plaintiff's release from the hospital. The documentation provided by Plaintiff in Plaintiff's Exhibit one (1) during the evidentiary hearing before Deputy Commissioner Houser, including correspondence dated October 13, 2006 and accompanying documentation concerning Plaintiff's home health care expenses, provides both a sufficient and reasonable basis upon which to reimburse Plaintiff for the home health care provided by Mr. Lyles. The Full *Page 13 
Commission finds, based upon the greater weight of the evidence, that such home health care was necessary to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability, and that Defendants should pay for the aforementioned home health care.
24. At the telephone hearing before the Full Commission, the parties agreed that they would allow Plaintiff's authorized treating physician(s) to determine whether Plaintiff requires a CT myelogram to his back, as well as an arthroscopic acromioplasty and subacromial bursectomy to his right shoulder. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's authorized treating physician(s) should determine whether Plaintiff requires a CT myelogram to his back, as well as an arthroscopic acromioplasty and subacromial bursectomy to his right shoulder, and that the parties will be bound by such determination.
25. At the telephone hearing before the Full Commission, the parties agreed that Dr. Sotolongo should be Plaintiff's authorized treating physician. The Full Commission finds, based upon the greater weight of the evidence, that the treatment provided by Dr. Sotolongo is necessary to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability; that Dr. Sotolongo should be Plaintiff's authorized treating physician; and that as Plaintiff's authorized treating physician, Dr. Sotolongo should determine whether Plaintiff requires a CT myelogram to his back, as well as an arthroscopic acromioplasty and subacromial bursectomy to his right shoulder. The parties will be bound by Dr. Sotolongo's determination concerning the propriety of Plaintiff undergoing the aforementioned procedures. Further, the Full Commission finds, based upon the greater weight of the evidence, that Defendants shall reimburse Plaintiff for the out-of-pocket expenses Plaintiff incurred in order to obtain the medications that Dr. Sotolongo prescribed to him that are related to his September 23, 1997 work injury, and that Defendants shall pay for any future medications that Dr. Sotolongo prescribes to him that are related to his *Page 14 
September 23, 1997 work injury, subject to proper documentation being submitted.
26. At the telephone hearing before the Full Commission, Defendants agreed that they would continue to pay for any and all expenses associated with Plaintiff's stimulator device for pain management. The Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's stimulator device is necessary to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability, and that Defendants should pay for the aforementioned stimulator device, for so long as it continues to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability.
27. At the telephone hearing before the Full Commission, Defendants acknowledged that they are obligated to pay for any medical treatment that would effect a cure, give relief, lessen Plaintiff's period of disability, and/or otherwise correct any physical deformity Plaintiff developed as a result of his September 23, 1997 work injury. The Full Commission finds, based upon the greater weight of the evidence, that the protruding mass on Plaintiff's right leg at the site of Plaintiff's right hip/leg surgery is causally related to his September 23, 1997 work injury, and that Defendants should pay for the surgical repair of this protruding mass, as recommended by Dr. Gutter.
28. Plaintiff and his counsel have a fee agreement allowing for a 25 percent attorney's fee, subject to the approval of the North Carolina Industrial Commission. However, the circumstances of this case justify departing from the Industrial Commission's usual and customary award of a 25 percent attorney's fee. From Plaintiff's September 23, 1997 work injury through the hearing before Deputy Commissioner Griffin, Plaintiff represented himself. From that time forward, Plaintiff's counsel represented Plaintiff. Therefore, the Full Commission finds, based upon the greater weight of the evidence, that Plaintiff's counsel is *Page 15 
entitled to an attorney's fee of 20 percent of the permanent partial disability compensation to which Plaintiff is entitled.
29. The Full Commission finds, based upon the greater weight of the evidence, that Defendants defended several issues in this claim without reasonable grounds, including the issues concerning the compensability of Plaintiff's home health care expenses, the designation of Dr. Sotolongo as Plaintiff's authorized treating physician, the reimbursement and payment of medications related to Plaintiff's September 23, 1997 work injury prescribed by Dr. Sotolongo, the payment of Plaintiff's stimulator device for pain management, and the payment of surgery required to correct the protruding mass on Plaintiff's right leg at the site of Plaintiff's right hip/leg surgery. However, the Full Commission is unable to assess attorney's fees pursuant to § 97-88.1 of the North Carolina General Statutes, since the North Carolina Insurance Guaranty Association is now providing workers' compensation insurance coverage to Defendant-Employer, in this case, and this case is considered to be a "covered claim," as that term is defined in § 58-48-20 of the North Carolina General Statutes.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident arising out of and in the course and scope of his employment with Defendant-Employer on September 23, 1997. N.C. Gen. Stat. § 97-2(6) (2007).
2. A finding of maximum medical improvement is a prerequisite to a determination of the amount of any permanent partial disability, pursuant to § 97-31 of the North Carolina *Page 16 
General Statutes. Roberts Welding Contractors, 117 N.C. App. 707, 711,453 S.E.2d 216, 219 (1995).
3. As a result of Plaintiff's September 23, 1997 work injury, Plaintiff retained a three (3) percent permanent partial disability rating to his back, for which Plaintiff is entitled to compensation at the rate of $407.69 for a period of 9 weeks, or $3,669.21. N.C. Gen. Stat. § 97-31(23) (2007).
4. As a result of Plaintiff's September 23, 1997 work injury, Plaintiff retained a 30 percent permanent partial disability rating to his right arm, for which Plaintiff is entitled to compensation at the rate of $407.69 for a period of 72 weeks, or $29,353.68. N.C. Gen. Stat. § 97-31(13) (2007).
5. As a result of Plaintiff's September 23, 1997 work injury, Plaintiff retained a 20 percent permanent partial disability rating to his right leg, for which Plaintiff is entitled to compensation at the rate of $407.69 for a period of 40 weeks, or $16,307.60. N.C. Gen. Stat. § 97-31(15) (2007).
6. There is insufficient evidence establishing any type of causal relationship between three (3) of Plaintiff's missing teeth and his September 23, 1997 work injury. Holley v. ACTS, Inc., 357 N.C. 228,581 S.E.2d 750 (2003); Young v. Hickory Business Furniture, 353 N.C. 227,538 S.E.2d 912 (2000).
7. The home health care Ms. Betty Lyles provided to Plaintiff was necessary to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability, and Defendants should pay for the aforementioned home health care. N.C. Gen. Stat. § 97-25 (2007).
8. Plaintiff's authorized treating physician(s) should determine whether Plaintiff requires a CT myelogram to his back, as well as an arthroscopic acromioplasty and subacromial *Page 17 
bursectomy to his right shoulder, and the parties will be bound by such determination. Id.
9. The treatment provided by Dr. Carlos Adrian Sotolongo is necessary to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability. Id. Dr. Sotolongo should be Plaintiff's authorized treating physician, and as Plaintiff's authorized treating physician, Dr. Sotolongo should determine whether Plaintiff requires a CT myelogram to his back, as well as an arthroscopic acromioplasty and subacromial bursectomy to his right shoulder. Id. The parties will be bound by Dr. Sotolongo's determination concerning the propriety of Plaintiff undergoing the aforementioned procedures.
10. Defendants shall reimburse Plaintiff for the out-of-pocket expenses Plaintiff incurred in order to obtain the medications that Dr. Sotolongo prescribed to him that are related to his September 23, 1997 work injury, and Defendants shall pay for any future medications that Dr. Sotolongo prescribes to him that are related to his September 23, 1997 work injury, subject to proper documentation being submitted.Id.
11. Plaintiff's stimulator device is necessary to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability, and Defendants should pay for the aforementioned stimulator device, for so long as it continues to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability. Id.
12. The protruding mass on Plaintiff's right leg at the site of Plaintiff's right hip/leg surgery is causally related to his September 23, 1997 work injury, and Defendants should pay for the surgical repair of this protruding mass, as recommended by Dr. Guido Peter Gutter.Id.
13. Plaintiff's counsel is entitled to an attorney's fee of 20 percent of the permanent partial disability compensation to which Plaintiff is entitled. N.C. Gen. Stat. § 97-90(c) (2007).
14. Defendants defended several issues in this claim without reasonable grounds, *Page 18 
including the issues concerning the compensability of Plaintiff's home health care expenses, the designation of Dr. Sotolongo as Plaintiff's authorized treating physician, the reimbursement and payment of medications related to Plaintiff's September 23, 1997 work injury prescribed by Dr. Sotolongo, the payment of Plaintiff's stimulator device for pain management, and the payment of surgery required to correct the protruding mass on Plaintiff's right leg at the site of Plaintiff's right hip/leg surgery. However, the Full Commission is unable to assess attorney's fees pursuant to § 97-88.1 of the North Carolina General Statutes, since the North Carolina Insurance Guaranty Association is now providing workers' compensation insurance coverage to Defendant-Employer, in this case, and this case is considered to be a "covered claim," as that term is defined in § 58-48-20 of the North Carolina General Statutes. N.C. Gen. Stat. §§ 58-48-20; 97-88.1 (2007).
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission makes the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, Defendants shall pay Plaintiff $3,669.21 for the 3 percent permanent partial disability rating to Plaintiff's back in one lump sum.
2. Subject to a reasonable attorney's fee herein approved, Defendants shall pay Plaintiff $29,353.68 for the 30 percent permanent partial disability rating to Plaintiff's right arm in one lump sum.
3. Subject to a reasonable attorney's fee herein approved, Defendants shall pay Plaintiff $16,307.60 for the 20 percent permanent partial disability rating to Plaintiff's right leg *Page 19 
in one lump sum.
4. Plaintiff's claim for medical compensation related to three (3) of Plaintiff's missing teeth is DENIED.
5. Defendants shall reimburse Plaintiff for the out-of-pocket expenses that Plaintiff incurred in order to obtain the home health care Ms. Betty Lyles provided to him.
6. Plaintiff's authorized treating physician(s) shall determine whether Plaintiff requires a CT myelogram to his back, as well as an arthroscopic acromioplasty and subacromial bursectomy to his right shoulder, and the parties will be bound by such determination.
7. Dr. Sotolongo shall be Plaintiff's authorized treating physician, and as Plaintiff's authorized treating physician, Dr. Sotolongo shall determine whether Plaintiff requires a CT myelogram to his back, as well as an arthroscopic acromioplasty and subacromial bursectomy to his right shoulder. The parties will be bound by Dr. Sotolongo's determination concerning the propriety of Plaintiff undergoing the aforementioned procedures.
8. Defendants shall reimburse Plaintiff for the out-of-pocket expenses Plaintiff incurred in order to obtain the medications that Dr. Sotolongo prescribed to him that are related to his September 23, 1997 work injury, and Defendants shall pay for any future medications that Dr. Sotolongo prescribes to him that are related to his September 23, 1997 work injury, subject to proper documentation being submitted.
9. Defendants shall pay for Plaintiff's stimulator device for so long as it continues to effect a cure, to give relief, and/or to lessen Plaintiff's period of disability.
10. Defendants shall pay for the surgical repair of Plaintiff's protruding mass on his right leg, as recommended by Dr. Guido Peter Gutter.
11. A reasonable attorney's fee of 20 percent of the compensation awarded to *Page 20 
Plaintiff in paragraph one (1), paragraph (2), and paragraph three (3), above, is hereby approved and shall be paid directly to Plaintiff's counsel.
12. Plaintiff's claim for attorney's fees pursuant to § 97-88.1 of the North Carolina General Statutes is DENIED.
13. Defendants shall pay the costs of these proceedings.
This the ___ day of October 2008.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/___________________ DANNY LEE McDONALD COMMISSIONER
S/___________________ CHRISTOPHER SCOTT COMMISSIONER
 *Page 1